UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ISMAHAN ISMAIL, | CASE NO. C16-1682JLR |
| Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| v. | |
| AMAZON.COM, | |
| Defendant. | |

## I.   INTRODUCTION

Before the court is Defendant Amazon.com's ("Amazon") motion for summary judgment.[1]  (MSJ (Dkt. # 27).)  Plaintiff Ismahan Ismail opposes the motion.  (Resp. (Dkt. # 37).)  The court has considered Amazon's motion, the parties' submissions in

---

[1] On June 1, 2018, the parties filed a stipulated motion to continue the trial date because Amazon's motion for summary judgment was still pending.  (Stip. MTC (Dkt. # 43) at 2.)  In addition, on June 4, 2018, the parties filed motions in limine.  (Def. MIL (Dkt. # 44); Pl. MIL (Dkt. # 45).)  The court DENIES as moot the motion to continue and the motions in limine.

support of and in opposition to the motion, the relevant portions of the record, and the applicable law. Being fully advised,[2] the court GRANTS Amazon's motion for summary judgment on Ms. Ismail's claims.

## II. BACKGROUND

### A. Factual Background

This case arises from Ms. Ismail's employment at Amazon's Global Security Command Center ("GSCC") in Phoenix, Arizona.[3] (*See* Am. Compl. (Dkt. # 22) ¶¶ 4.1-4.2; Blatt Decl. (Dkt. # 30) ¶ 3, Ex. 2 (Dkt. # 30-2) ("Ismail Dep.") at 67:23-68:11.)[4] Ms. Ismail began working full-time for Amazon's GSCC in December 2013. (Ismail Dep. at 17:15-18.) Ms. Ismail was responsible for "protect[ing] [Amazon's] people, brand[,] and property," putting "together safety reports," "answer[ing] alarms," "deal[ing] with incoming phone calls," and "assist[ing] security officers." (*Id.* at 68:23-69:3.) During the relevant period, Ms. Ismail worked the 12-hour night shift on GSCC's Team 4 with Saul Chavez, Migail Graves, J'Dyn Banks, Kyle Pearson, and Halle Matteson. (Peterson Decl. (Dkt. # 33) ¶ 2; Ismail Decl. ¶ 7; Ismail

---

[2] Amazon requests oral argument (MSJ at 1), but the court determines that oral argument would not help its disposition of the motion, *see* Local Rules W.D. Wash LCR 7(b)(4).

[3] The parties refer to various job titles for Ms. Ismail: Security Risk Analyst, Physical Operations Security Specialist, and Alarm Monitoring Associate. (Ismail Decl. (Dkt. # 38) ¶ 21; Am. Compl. ¶ 4.2; MSJ at 6.) It appears that Ms. Ismail began as either a Security Risk Analyst or Physical Operations Security Specialist and then became an Alarm Monitoring Associate upon moving to Phoenix. (*See* Resp. at 1.)

[4] For Ms. Ismail's deposition only, the court cites the page numbers with which the court reporter marked the deposition. For all other exhibits, the court cites the ECF page numbers.

Dep. at 85:8-10.)  Mr. Chavez, Mr. Graves, and Mr. Banks had the same job title as Ms.

Ismail.  (*See* Peterson Decl. ¶ 2.)  Mr. Pearson was the assistant manager, and Ms.

Matteson had a supervisory role over Ms. Ismail.  (*See* Peterson Decl. ¶ 2; Ismail Dep. at

86:14-87:18.)  When Ms. Ismail first started working at the GSSC, Charles Wyatt was

her manager, followed by Levy Bland,[5] and then Braden Peterson.  (*See* Ismail Decl. ¶ 6;

Bland Decl. (Dkt. # 29) ¶ 2; Peterson Decl. ¶ 1.)

At all relevant times, Amazon policy "provided that full-time associates working

twelve-hour shifts received a minimum of three, ten-minute paid breaks and a

thirty-minute unpaid meal period."  (Renner Decl. (Dkt. # 34) ¶ 2; *see also id.*, Ex. 66

("Break Policy") at 4-5.)  In addition, associates could not work "longer than twelve

hours at a time."  (Renner Decl. ¶ 2; *see also* Break Policy at 3.)  Amazon further allowed

a five-minute "grace period" for unanticipated situations that would delay or hasten an

employee's clock-in or clock-out time and a three-minute grace period for a meal break.

(Feulner Decl. (Dkt. # 39), Ex. 504 at 56.)  The parties refer to the paid breaks as

15-minute breaks, presumably because after accounting for the ten minutes provided by

Amazon policy and the five minutes of grace time, the total time was 15 minutes.  (*See,*

*e.g.*, Ismail Decl. ¶ 8.)

Ms. Ismail was aware of Amazon's formal policy that she receive three 15-minute

paid breaks and one unpaid 30-minute lunch break, but contends that "there was little

---

[5] Amazon promoted Mr. Bland in late September 2014, and he accordingly moved to a
different shift at that time.  (Bland Decl. ¶ 3.)  He remained Ms. Ismail's supervisor, however,
until Braden Peterson became the manager for Team 4.  (*Id.*)

guidance given to [Team 4 members] about breaks and expectations about breaks."
(Ismail Decl. ¶ 8.) She attests that Amazon did not "strictly enforce[]" the policy and
employees often took more than three breaks. (*Id.*) As examples, Ms. Ismail states that
"[p]eople on [her] team would take breaks to go smoke a cigarette, go get food from the
local restaurants, or go to the break room." (*Id.*) She believed such breaks were
permitted if she "got coverage before going on a break from other employees on the
team." (*Id.*) In addition to breaks, Ms. Ismail states that "employees on the night shift
were permitted to be away from their desk[s] or doing other tasks during slow periods."
(*Id.* ¶ 9.) During those slow periods, employees watched TV, played video games,
played miniature golf, did their homework, or used their phones. (*See id.*; *see also* Ismail
Dep. at 97:2-12.)

　　　　Ms. Ismail is a practicing Muslim and prays five times a day. (Ismail Decl. ¶ 3.)
To her knowledge, she was the only practicing Muslim on Team 4. (*Id.*; *see also id.* ¶ 10
(Ms. Ismail "was not secretive about wearing . . . prayer clothes" and believed "that every
employee on Team 4 saw [her] change into prayer clothes at some point during [her] time
at GSCC.").) Because Ms. Ismail worked the night shift at Amazon, she "could not do
the prayers during the day and did the prayers while [she] was awake during [her] shift."
(*Id.* ¶ 3.) Ms. Ismail contends that her co-workers knew she used her breaks to pray, and
states that she stored her "prayer materials" in a "cubby . . . where employees were
expected to store their stuff." (*Id.*)

//

//

The facts in this case center on Ms. Ismail's interactions with her coworkers and supervisors, Ms. Ismail's breaks, and Amazon's investigations of Ms. Ismail's complaints and behavior at work.[6]  In roughly chronological order, the court recounts below the events giving rise to Ms. Ismail's leave of absence from Amazon and her claims.

In October and November 2014, while Mr. Bland was Ms. Ismail's manager, he "coached" her several times about matters related to her performance.  (Bland Decl. ¶ 4, Ex. 41 ("Coaching") at 2.)  On October 10, 2014, Mr. Bland told Ms. Ismail not to leave Amazon "to get food for lunch while still on the clock," not to have her "cell phone out on the operations floor," not to have social media websites "constantly up on [her] computer," and not to play games on work computers.  (*Id.*)  Mr. Bland also advised Ms. Ismail that he expected her to log into her computer at the time that her shift started and

---

[6] The parties describe three events tangential to the issues Amazon's motion raises.  The first is a 2014 incident involving Ms. Ismail and another GSCC employee, Mahad Farah, who was also Ms. Ismail's roommate at the time.  (*See* Macklin Decl. (Dkt. # 31) ¶ 2, Ex. 79 ("2/10/14 Rep.") at 2; Ismail Decl. ¶ 11.)  The incident only provides context for Ms. Ismail's claims, and so the court considers it only in that respect.  (*See* Resp. at 3 n.3 (conceding "that any claims based on this incident are barred by the statute of limitations," but contending that the incident "can be used as evidence to support claims of discrimination and retaliation based on discrete incidents that have been properly exhausted")); *infra* § III.B.1.  Second, Ms. Ismail states that Mr. Peterson used a picture of a black sheep in a group chat to refer to Ms. Ismail.  (*See* Resp. at 11; Ismail Dep. at 157:9-14.)  She understood Mr. Peterson to refer to her race by using the picture.  (Ismail Dep. at 157:9-14.)  Because Ms. Ismail concedes that she lacks sufficient evidence in support of her race discrimination claims, the court addresses the incident only to the extent that Ms. Ismail invokes it to show an adverse employment action.  (Resp. at 14); *see also infra* § III.B.2-3.a.  Third, Ms. Ismail was injured on the job while she and her coworkers were playing "Nerf basketball" during their shift.  (*See* Feulner Decl. ¶ 21, Ex. 519, at 121.)  The Industrial Commission of Arizona reviewed and issued a decision on Ms. Ismail's workers compensation claim.  (*See id.* at 119.)  She makes no argument, however, regarding how her injury and workers compensation claim are relevant to the instant motion.  (*See, e.g.*, Resp. at 9.)

that "[t]he time clock grace period is to protect pay[,] not attendance." (*Id.*) On October 16, 2014, Mr. Bland addressed with Ms. Ismail errors she had made in processing notifications and told her that continued errors would result in her being demoted. (*Id.*) On November 8, 2014, Mr. Levy "coached" Ms. Ismail about her excessive tardiness, which arose because of medical and car problems. (*Id.*; Ismail Dep. at 229:5-13.) Ms. Ismail's time cards reflect that she was early for 13 of 15 shifts during the remainder of November 2014, early for 13 of 16 shifts in December 2014, and early or on time for 14 of 15 shifts in January 2015. (Feulner Decl. ¶ 2, Ex. 500 (Dkt. # 39-1) at 7 (summarizing Ms. Ismail's work start times).)[7]

Also in November 2014, Amazon promoted Ms. Ismail to Escalation Specialist.[8] (Ismail Decl. ¶ 15.) After her promotion, Ms. Ismail experienced difficulties with Migail Graves, the other Escalation Specialist on Team 4. (*Id.*) She states that Mr. Graves was "incredibly rude and abusive" to her. (*Id.*) She informed Mr. Bland and Mr. Pearson about Mr. Graves' behavior. (*Id.* ¶¶ 15-16, 20.) Despite Mr. Graves's alleged verbal abuse, Ms. Ismail contends that neither manager reprimanded him. (*Id.* ¶¶ 16-17, 19-20.) However, on January 23, 2015, Mr. Bland coached Ms. Ismail on what he determined

---

[7] Ms. Ismail asks the court to consider the summary pursuant to Federal Rule of Evidence 1006. (*See* Resp. at 5 n.5); Fed. R. Evid. 1006. Rule 1006 provides that a proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. The court so considers the summary because it presents evidence "in a form that would be admissible." *See* Fed. R. Civ. P. 56(c)(2).

[8] Although Ms. Ismail's pay did not increase, her new job entailed greater responsibility. (*Id.*)

was her unprofessional behavior related to her interactions with Mr. Graves.  (Coaching at 2.)

In January 2015, Amazon moved Ms. Ismail back into her previous role, which Ms. Ismail characterizes as a demotion.  (Ismail Decl. ¶ 21; *see also* Resp. at 6 (stating that Ms. Ismail was demoted after complaining about Mr. Graves).)  When Mr. Bland told Ms. Ismail about the decision, Ms. Ismail informed him that she "was primary on everything" and "doing the majority of the work."  (Ismail Decl. ¶ 21.)  In addition, Ms. Ismail asked Mr. Bland whether he considered moving Mr. Graves back to his former role instead, and, according to Ms. Ismail, Mr. Bland told her that Mr. Graves "was better than [her] as an Escalation Specialist."  (*Id.*)  Mr. Bland moved J'dyn Banks into the role of Escalation Specialist during the night shift.  (*Id.*)  Mr. Bland said that Mr. Banks had seniority, but Ms. Ismail contends that Mr. Banks "did not have any seniority over" her. (*Id.*)  Ms. Ismail did not further contest the move.  (*See id.*)

During the same general timeframe as those events, Ms. Ismail applied for four internal transfers—two in December 2014 and two in January 2015.  (Feulner Decl. ¶ 16, Ex. 514 (Dkt. # 39-2) at 15-17.)  To interview for an open internal position, Amazon policy requires manager approval for employees who were not meeting standards. (Bland Decl. ¶ 5, Ex. 42 at 2 (providing an Amazon policy that states that "[e]mployees who are not currently meeting performance standards must obtain manager approval before interviewing").)  Mr. Bland declined to give Ms. Ismail the necessary approval, stating that he would support a transfer only after "a sustained period of improvement." (Bland Decl. ¶ 5; *see also* Feulner Decl. ¶ 16, Ex. 514 at 15 (stating that Mr. Bland

denied Ms. Ismail the opportunity to interview for a transfer because "several leadership principles . . . need[ed] improvement"); *id.* ¶ 3, Ex. 501 at 30.)  Amazon's transfer team told Mr. Bland to "ensure that performance comments are limited to those that are formally documented in performance management systems."  (Feulner Decl. ¶ 16, Ex. 514 at 15.)  According to Ms. Ismail, despite Mr. Bland's coaching regarding her performance, her first two managers never expressed concern with the length of breaks she took.  (Ismail Decl. ¶ 6; *see also* Ismail Dep. at 73:20-23; Feulner Decl. ¶ 9, Ex. 507 at 182.)

However, Braden Peterson became the manager of Team 4 on or around February 20, 2015 (Peterson Decl. ¶ 1), and took a different approach to Amazon's break policy (*see* Peterson Decl. ¶ 3; Ismail Decl. ¶ 6).[9]  According to Mr. Peterson, "[o]ne of the first things [he] noticed after taking supervision of [his] team was that there was little communication surrounding break times, and even less structure about when it was appropriate to take them."  (Peterson Decl. ¶ 3; *see also* Feulner Decl. ¶ 7, Ex. 505 at 53 (quoting Amazon Human Resources ("HR") Manager Erin Klump as stating that "[b]reaks and lunches have not been defined for the GSCC.  People come and go as they please.").)  Shortly after moving into the supervisory role, Mr. Peterson "made [his] expectation surrounding breaks very clear."  (Peterson Decl. ¶ 3)  His "expectation was that everyone would take three 15[-]minute breaks and a 30[-]minute lunch, and would [be] back in their seats . . . to ensure that they were ready to work again."  (*Id.*)  He

---

[9] Mr. Peterson reported to Mike Butler, Manager for Amazon's North American Regional Operation Center.  (Peterson Decl. ¶ 1.)

further states that he also told Team 4 "that anything outside of [the policy] would require escalation to [him], so that [he could] ensure proper coverage across the team." (*Id.*)

In emphasizing compliance with Amazon's break policy, Mr. Peterson began to focus on Ms. Ismail. (*See id.* ¶¶ 5-6.) He "observed that Ms. Ismail often took 45-minute lunch breaks and paid breaks lasting up to 46 minutes and that she took paid breaks during every four-hour work segment."[10] (*Id.* ¶ 5.) Mr. Peterson further attests that Ms. Ismail "often left the premises" and returned with "food from local restaurants." (*Id.*) In addition to the longer breaks, Mr. Peterson also observed Ms. Ismail work longer than her maximum 12-hour shift. (*Id.* ¶ 7; *see also id.*, Ex. 48A.) However, Ms. Ismail counters that she "had the fewest number of [lunch] breaks that went over 30 minutes between February 1, 2015, and May 8, 2015." (Resp. at 7 (citing Feulner Decl. ¶ 23, Ex. 521 at 142-45).)

On March 6, 2015, Mr. Peterson and Ms. Ismail had an introductory meeting. (Peterson Decl. ¶ 4; Ismail Decl. ¶ 22.) During that meeting, they discussed Ms. Ismail's breaks, and Ms. Ismail told Mr. Peterson that she took extended breaks to accommodate her prayer schedule. (Peterson Decl. ¶ 4.) Ms. Ismail told Mr. Peterson that she "prayed during [her] breaks" and "used the conference room" to do the prayers. (Ismail Decl. ¶ 22.) At that time, Ms. Ismail believed that Mr. Peterson had no problems with her taking extended breaks. (*Id.*) Mr. Peterson states that, based on the meeting, he

---

[10] During this same general timeframe, Ms. Ismail contacted Mr. Peterson to express interest in a trip to Prague to train staff at a new command center there. (Ismail Decl. ¶ 23.) Mr. Peterson "later informed" Ms. Ismail that she "could not go on the trip to Prague." (*Id.*)

"assumed that Ms. Ismail was combining some of her paid breaks to accommodate her prayers." (Peterson Decl. ¶ 4.) It does not appear that they agreed to any plan concerning Ms. Ismail's breaks during this meeting. (*See generally* Peterson Decl.; Ismail Decl.)

On March 12, 2015, Mr. Peterson "reached out to [his] manager, who reached out to [HR], and requested guidance" about Ms. Ismail's need to take longer breaks. (Peterson Decl. ¶ 6; *see also id.*, Ex. 48.) Amazon's HR department advised Mr. Peterson "to have a conversation with Ms. Ismail concerning [his] expectations around break times and seek to understand the reasons she was taking such long breaks." (*Id.* ¶ 6.) A couple of weeks later, Mr. Peterson also notified HR that Ms. Ismail worked 20 minutes past her maximum 12-hour shift. (*Id.* ¶ 7; *see also id.*, Ex. 48A.)

Mr. Peterson and Ms. Ismail met again on March 27, 2015. (Peterson Decl. ¶ 8; Ismail Decl. ¶ 24.) During that meeting, Ms. Ismail informed Mr. Peterson that "she combine[d] prayers, not breaks as [he] had assumed, and because she combined prayers, she needed slightly longer breaks." (Peterson Decl. ¶ 8.) According to Mr. Peterson, slightly longer breaks were permissible but he wanted to "establish[] clear expectations concerning how much time she would be taking." (*Id.*) Ms. Ismail states that it "was difficult for [her] to identify a specific amount of time" she needed for prayers because she did not "necessarily spend [her prayer time] watching the clock." (Ismail Decl. ¶ 24.) Mr. Peterson states that Ms. Ismail agreed that 20 minutes per break and a 30-minute lunch break would suffice (Peterson Decl. ¶ 8), while Ms. Ismail states that she "agreed to try" the 20-minute breaks (Ismail Decl. ¶ 24.) After the meeting, Mr. Peterson emailed Mr. Butler to memorialize his understanding that Ms. Ismail take 20-minute breaks going

forward.  (Peterson Decl. ¶ 8; *see also id.*, Ex. 49 at 2 (emailing Mr. Butler a summary of the purported agreement).)

On March 28, 2015, Mr. Peterson states that Ms. Ismail took a 42-minute lunch break.  (*Id.* ¶ 9; *see also id.*, Ex. 50 (stating that although Ms. Ismail clocked in at the 30-minute mark, she remained on break—and did not work—for an additional 12 minutes).)  Ms. Ismail disputes that contention.[11]  (Resp. at 7.)  Mr. Peterson emailed Ms. Ismail to remind her of the agreement from the previous day, and emailed Mr. Butler to inform him that Ms. Ismail's break extended beyond the agreed 30 minutes.  (Peterson Decl. ¶¶ 9-10.)  Ms. Ismail responded that 20-minute breaks were in fact not long enough and said she needed three 30-minute breaks instead.  (*Id.* ¶ 10; *see also* Ismail Decl. ¶ 25 (" . . . I indicated that I felt like 20 minutes was too short. . . . and that I needed thirty minutes.").)  Mr. Peterson conveyed that request to HR.  (Peterson Decl. ¶ 10.)  Ms. Ismail then emailed Mr. Butler on March 29, 2015, because she felt that Mr. Peterson "was becoming increasingly hostile and fixated about wanting to talk about [her] breaks." (Ismail Decl. ¶ 25.)

Also on March 29, 2015, Ms. Ismail took another a 42-minute lunch and again worked past her 12-hour shift.  (Peterson Decl. ¶¶ 11-12.)  During this same general

---

[11] In disputing this contention, Ms. Ismail cites Mr. Peterson's email to Mr. Butler, in which Mr. Peterson states that Ms. Ismail took a 42-minute lunch.  (Resp. at 7 (citing Peterson Decl. ¶ 9, Ex. 50 at 2).)  She states in a footnote that Amazon "did not preserve the original information" from "a system that purportedly show[s] the break times of various associates." (*Id.* at 7 n.7.)  Accordingly, Ms. Ismail states that "it is impossible to know if the system would have supported Amazon's claims or shown disparate treatment."  (*Id.*)  However, Ms. Ismail does not argue for an adverse inference, and it appears that Ms. Ismail has records of the break times because she offers such records in opposition to the motion for summary judgment.  (*See* Resp. at 7 (citing Feulner Decl. ¶ 23, Ex. 521 at 142-45).)

timeframe, Ms. Matteson reported to Mr. Peterson that Ms. Ismail had called her

coworkers "lazy asses," which Ms. Ismail disputes. (*Id.* ¶ 13; Ismail Decl. ¶ 27 (". . . I

never said that people were lazy asses.").) On March 31, 2015, HR "approved giving Ms.

Ismail a documented verbal coaching concerning her long lunch breaks." (Peterson Decl.

¶ 12; *see also* Renner Decl. ¶ 4.) On April 2, 2015, Mr. Peterson met with Ms. Ismail to

deliver the "coaching." (Peterson Decl. ¶ 12.)

During the April 2, 2015, coaching session, Mr. Peterson asked Ms. Ismail to sign

a document stating that she had violated Amazon's rules because she took long lunches.

(Ismail Decl. ¶ 30; Peterson Decl. ¶ 12.) She refused to sign because she thought the

document was incorrect. (*Id.*; *see also* Peterson Decl. ¶ 12.) At this time, Ms. Ismail

asked Mr. Peterson to involve HR in future meetings and told him she felt he was

discriminating against her by "treating [her] breaks differently than others[' breaks]."[12]

(Ismail Decl. ¶ 30.)

Two other events also occurred on April 2, 2015. First, Ms. Ismail met with Mr.

Butler to discuss Mr. Bland's "favoritism toward other employees, Mr. Peterson's

discrimination and harassing [her] related to [her] prayer breaks, and the lack of

teamwork in Team 4." (Ismail Decl. ¶ 28.) She initially thought the "meeting went well

because Mr. Butler told [her] that there were lots of issues that the GSCC needs to fix and

that he would work on it." (*Id.*) Second, later in the day, Ms. Ismail noticed that her

---

[12] Ms. Ismail also brought up the Prague trip again because one of her coworkers was allowed to go. (Ismail Decl. ¶ 30.) According to Ms. Ismail, Mr. Peterson "abruptly stated something to the effect of 'That's it' and walked out of the room." (*Id.*)

prayer cloth was "in a different cubby and was folded in a different way" and "saw that there was a big boot mark" on it.[13] (*Id.* ¶ 29; *see also* Ismail Dep., Ex. 19 (showing the marks on Ms. Ismail's prayer cloth).) She felt "terrified and traumatized" and could not complete her prayers because her "prayer items must be clean in order for [a] prayer to be accepted." (*Id.*) Ms. Ismail infers that Mr. Peterson intentionally stepped on her prayer cloth because she noticed that he wore boots that night and he had been focused on her breaks.[14] (*Id.*) By the end of her shift that day, Ms. Ismail felt that her earlier conversation with Mr. Butler had been futile because she continued "to feel discriminated against." (Ismail Decl. ¶ 31.)

On April 7, 2015, Mr. Butler sent an email to Kristen Macklin in Amazon's HR department, reporting Ms. Ismail's "insubordination" and "highly recommend[ing]" that Amazon "move to termination." (Feulner Decl. ¶ 19, Ex. 517 at 54-55.) Ms. Macklin, however, informed Mr. Butler that termination could result only from an investigation into Ms. Ismail's conduct. (*Id.* at 53.) Accordingly, Paige Renner from HR met with Ms. Ismail that same day to interview her. (*See* Renner Decl. ¶ 5; *see also id.*, Ex. 67 (notes of the meeting).) During that meeting, Ms. Renner discussed Ms. Ismail's breaks, her need to adhere to 12-hour shifts, her coworkers' reports of unprofessional conduct, and

---

[13] Mr. Peterson said that video could be used to investigate the incident (Feulner Decl. ¶ 18, Ex. 516), but Ms. Ismail contends that "Amazon took no steps to actually look at the video and the video has not been preserved" (Resp. at 8).

[14] Ms. Ismail did not report the incident that day. (*See id.*; *see also* Feulner Decl. ¶ 11, Ex. 509 at 190 (April 3, 2015, email from Ms. Ismail to Mr. Butler stating only that she "was approached once again by [Mr. Peterson] regarding [her] prayer breaks and lunch break").)

her failure to complete the self-review. (*See* MSJ at 11; Renner Decl. ¶ 5, Ex. 76 (attaching notes from the meeting).) Ms. Renner told Ms. Ismail that she would look into the policy regarding Ms. Ismail taking additional break time to allow for her prayers and that Ms. Renner thought any additional time would be unpaid. (Renner Decl. ¶ 5, Ex. 76, at 2.) Ms. Renner also "coached" Ms. Ismail regarding not working longer than 12 hours unless she had her manager's approval. (*Id.* at 2-3.) Ms. Renner also asked Ms. Ismail about her coworkers' reports of "outbursts" and her refusals to follow her supervisors' instructions. (*Id.* at 3.) Finally, Ms. Ismail explained that she had completed her self-evaluation but a computer glitch had erased it. (*Id.*) Ms. Ismail nevertheless agreed to complete the evaluation during that shift. (*See id.*)

Immediately after the April 7, 2015, meeting, Ms. Ismail worked on her self-evaluation. (Peterson Decl. ¶ 14; Ismail Decl. ¶ 33.) The parties offer differing accounts of Mr. Peterson's interactions with Ms. Ismail while she was working on the evaluation. (*Compare* Peterson Decl. ¶¶ 14-15, *with* Ismail Decl. ¶ 33.) Mr. Peterson states that he asked Ms. Ismail if she was going to respond to her alarms when she returned to her desk after meeting with Ms. Renner. (Peterson Decl. ¶ 14.) Ms. Ismail told him no because "she was working on something" for HR. (*Id.*) Mr. Peterson then asked her whether she could do that while she answered alarms, and she said she could not. (*Id.*) Ms. Ismail contends that Mr. Peterson had an "aggressive and intimidating" tone during this incident and "became more aggressive" as he questioned her about answering the alarms. (Ismail Decl. ¶ 33.) She also states that Mr. Peterson told her to cover the alarms while she worked on the evaluation. (*Id.*) Ms. Renner told Ms. Ismail

to have Mr. Peterson call Ms. Renner. (*Id.* ¶ 34.) After Mr. Peterson spoke to Ms. Renner, Mr. Peterson told Ms. Ismail to "do what [she] was originally doing." (*Id.*) She states that she missed her prayer that day because she "was trying to complete [her] review." (*Id.*)

On April 12, 2015, Mr. Bland issued Ms. Ismail her first performance review as an Amazon employee and rated her as "needing improvement."[15] (Bland Decl. ¶ 10, Ex. 45; Feulner Decl. ¶ 19, Ex. 517.) Mr. Bland also rated Mr. Chavez as needing improvement.[16] (*See* Bland Decl. ¶ 6; *see also id.*, Ex. 43 (referencing a performance improvement plan for Mr. Chavez)); Feulner Decl. ¶ 3, Ex. 501 at 26.) Ms. Ismail refused to acknowledge that she had received her review, and Mr. Bland reported that refusal to HR. (Bland Decl. ¶¶ 10-11, Exs. 46-47.) After this meeting, Ms. Matteson reported to Mr. Peterson that Ms. Ismail made the following comments when she returned to her work station after the performance review: "The nerve"; "Waste of my fucking time"; "This place gets funnier and funnier by the minute"; "Retarded ass"; and "This place was pure fucking comedy." (Bland Decl. ¶ 16.) Ms. Ismail states that she never used that language or caused a disruption. (*See* Ismail Decl. ¶ 27.)

//

---

[15] Mr. Bland reviewed Ms. Ismail's performance because Mr. Peterson had not become the manager of Team 4 until February 2015. (Bland Decl. ¶ 6.)

[16] Ms. Ismail asserts that "Amazon has never been able to produce the corrective action" for Mr. Chavez. (Resp. at 3 n.2.) However, Mr. Bland's testimony regarding rating Mr. Chavez as needing "improvement" (*see* Bland Decl. ¶ 6) is sufficient evidence in support of Amazon's contention.

On April 13, 2015, Mr. Butler again asked HR for approval to terminate Ms. Ismail based on her failure to timely complete the self-evaluation portion of her performance review, refusal to meet with Mr. Peterson, and her disrespect toward her managers and coworkers. (Renner Decl. ¶ 7.) HR instead decided to further investigate those matters. (*Id.*) Thus, on April 20, 2015, Ms. Renner and HR "business partner" Amanda Berggren interviewed Ms. Ismail and the other Team 4 members. (*Id.*; *see also id.*, Ex. 69 (attaching notes of the interviews).) During the interviews, most of Ms. Ismail's coworkers reported that Ms. Ismail had made inappropriate comments or been rude to other Team 4 members. (*See, e.g.*, *id.*, Ex. 69 at 5-6, 12-13.) Saul Chavez, however, stated that he had not witnessed any "inappropriate" behavior on Team 4. (*Id.* at 7; *see also id.* at 9-10.)

Also on April 20, 2015, Ms. Matteson complained to Mr. Peterson that Ms. Ismail lacked professionalism in an interaction. (*See* Peterson Decl. ¶ 17; *see also id.* ¶¶ 13, 16 (describing other incidents of unprofessional behavior).) Based on that complaint, on April 21, 2015, Ms. Berggren and Steven Jensen, Senior Program Manager for Global Security Operations, interviewed Ms. Ismail about the incident involving Ms. Matteson. (Renner Decl. ¶ 8, Ex. 70 at 2-3.) On April 23, 2015, Ms. Renner and Ms. Berggren concluded their investigation and "recommended that Amazon end its employment relationship with Ms. Ismail based on her violations of Amazon's standards of conduct." (*Id.* ¶ 9.) On April 24, 2015, they forwarded their conclusion to Ms. Klump. (*Id.*, Ex. 72.) Instead of terminating Ms. Ismail, however, Amazon decided to issue her a final written warning on May 18, 2015. (Peterson Decl. ¶ 18, Ex. 58.)

On April 24, 2015, Ms. Ismail made her first complaint with Amazon's Ethics Hotline.[17]  (Renner Decl. ¶ 10, Ex. 74 ("1st Ethics Compl.") at 2.)  She reported that Mr. Peterson was discriminating against her because of how he treated her breaks.  (*Id.* at 4.)  She said she had been "denied overtime or a transfer," not "given any projects," and "isolated from her team."  (*Id.*)  She reported that Mr. Peterson was "fine" with her prayer breaks at first, but "later started asking why [the] breaks were taking so long" and "tried to write [her] up for taking prayer breaks."  (*Id.*)

On April 26, 2014, Ms. Matteson again reported that Ms. Ismail had made unprofessional comments.  (Peterson Decl. ¶ 19; *id.* ¶ 19, Ex. 59 at 2.)  Mr. Peterson attempted to meet with Ms. Ismail "to seek to understand what had occurred," but Ms. Ismail refused to meet.  (*Id.* ¶ 19.)

On May 5, 2015, Amazon confirmed that it would treat the additional time Ms. Ismail needed for her breaks as it treated additional break time for nursing mothers:  Any additional break time beyond the paid 15-minute break periods would be allowed but unpaid.  (Berggren Decl. (Dkt. # 28) ¶ 4; *see also id.*, Ex. 76 at 2 ("[T]his is a religious accommodation and should be handled just like a nursing mother.  Any time [s]he takes for this accommodation should be coded as unpaid."); Renner Decl. ¶ 2; *see also id.* ¶ 6, Ex. 68.)

---

[17] As Ms. Ismail points out (Resp. at 9), Amazon's Workplace Harassment & Equal Employment Opportunity Policy Acknowledgment Form states that if any employee has "concerns that [he or she is] being subjected to any form of discrimination, harassment[,]or retaliation in violation of Amazon's policies, [he or she] should immediately bring this to the attention of a[n HR] representative, [his or her] supervisor, any other manager, the Legal Department, or . . . Amazon's Ethics Line" (Feulner Decl. ¶ 13, Ex. 511 at 2).

On May 8, 2015, Ms. Berggren and Mr. Peterson met with Ms. Ismail to relay that arrangement. (Berggren Decl. ¶¶ 4-5; Peterson Decl. ¶ 20; Ismail Decl. ¶ 38.) Ms. Berggren told Ms. Ismail that Amazon would "allow" Ms. Ismail to pray and would accommodate her prayer by providing her with additional "excused," unpaid time in addition to her paid breaks.[18] (Berggren Decl. ¶ 5; Ismail Decl. ¶ 37.) Ms. Ismail was offended by Ms. Berggren's comment that Amazon would "allow" Ms. Ismail to pray. (Ismail Decl. ¶ 38; *see also* Berggren Decl. ¶ 5, Ex. 77 at 2.) Ms. Ismail refused the unpaid break time because she felt that "was being treated differently than other employees by being required to clock out" for prayer breaks, which would decrease her pay. (*Id.*; Berggren Decl. ¶ 5, Ex. 77 at 2) According to Mr. Peterson, Ms. Ismail became "irate, hostile, and raised her voice." (Peterson Decl. ¶ 20; *see also id.*, Ex. 62 (Dkt. # 33-16) at 2-3.) Mr. Peterson contends that he enforced Amazon's break policy consistently across the department and had spoken specifically with three other employees about the expectation. (*Id.* ¶ 20, Ex. 62 at 2.) Mr. Peterson denied knowing about the damage to Ms. Ismail's prayer cloth. (*Id.* at 3.)

Ms. Ismail terminated the meeting to phone in a second complaint to the Ethics Hotline. (*Id.* ¶ 20, Ex. 62 at 2; Ismail Decl. ¶ 38; Berggren Decl. ¶ 6, Ex. 78 ("2d Ethics Compl.").) Ms. Ismail identified three other Amazon employees who she believed were

---

[18] HR consulted Amazon's accommodations team, which confirmed that requests for additional break time were to be handled as Amazon handled extended breaks for nursing mothers. (*See* Berggren Decl. ¶ 4; Renner Decl. ¶ 2.) Amazon gave nursing mothers excused, unpaid time for breaks beyond 15 minutes. (*See* Berggren Decl. ¶ 4, Ex. 76; Renner Decl. ¶ 2, Ex. 66 at 4.)

paid for their prayer time and stated that she believed it was unfair that Amazon paid those employees for their prayer time but would not pay her. (2d Ethics Compl. at 3.) Ms. Ismail also stated that Mr. Peterson had stepped on her prayer cloth, leaving a boot mark on it. (*Id.*) Ms. Ismail also complained that Mr. Peterson yelled at her to clear a security alarm at the time she was writing a statement for HR. (*Id.*).

After the May 8, 2015, meeting, Mr. Peterson contends that Ms. Ismail's breaks for the rest of that shift were longer than allowed. (Peterson Decl. ¶ 21, Ex. 63 (Dkt. # 33-17); *id.* ¶ 21, Ex. 64 (Dkt. # 33-18); *id.* ¶ 2, Ex. 65 (Dkt. # 33-19).) Specifically, he stated that she spent 80 minutes "off task . . . away from [her] work station, while clocked in." (*Id.* ¶ 21, Ex. 63 at 2; *id.* ¶ 22, Ex. 65 (stating that Ms. Ismail spent 126 minutes "off task" during that shift).) Ms. Ismail asserts that Mr. Peterson knew she was calling the Ethics Hotline during that time. (Resp. at 11.)

Based on the May 8, 2015, ethics complaint, Amanda Murrow, an HR "business partner" at Amazon, conducted a second investigation and interviewed all of the Team 4 members. (Murrow Decl. (Dkt. # 32) ¶¶ 1, 3, 5-7.) Ms. Murrow could not substantiate Ms. Ismail's allegations. (*Id.* ¶ 3; *see also id.*, Ex. 81 ("5/25/15 Rep.") at 2.) Of the five employees interviewed, only one—Saul Chavez—reported that Mr. Peterson was unfair. (*Id.* at 6.) Mr. Chavez cited Mr. Peterson's "coaching" of him for coming back late after a lunch break and Mr. Peterson asking Ms. Ismail to multitask. (*Id.*) The other employees reported that Mr. Peterson treated everyone fairly and that they had never witnessed Mr. Peterson yelling at any employees. (*See id.* at 5-7.) In addition, Ms. Murrow interviewed the three other Muslim employees Ms. Ismail identified about their

1  prayer break time.  (*Id.* at 5.)  Those employees reported that they did their prayers during

2  the three paid breaks and the one unpaid lunch break and did not need additional time.

3  (*Id.*)

4       Based on her interviews, Ms. Murrow concluded that she could not substantiate

5  Ms. Ismail's claims that (1) Ms. Ismail had been unable to observe her regular prayer

6  times, (2) Mr. Peterson had discriminated against Ms. Ismail, (3) other Muslim

7  employees were paid for their prayer time beyond the three paid breaks Amazon provided

8  to every employee, (4) Mr. Peterson stepped on her prayer cloth, or (5) Mr. Peterson

9  yelled at Ms. Ismail.  (*Id.* at 8-9.)  Finally, Ms. Murrow concluded that there was a hostile

10  work environment, but "not for the reasons" Ms. Ismail identified.  (*Id.* at 8.)  Ms.

11  Murrow determined that Ms. Ismail's "verbal outbursts and erratic behavior over the last

12  few months have created an uncomfortable and stressful environment for five out of the

13  seven members of the team."  (*Id.*)

14       As a result of the investigation, on May 18, 2018, Amazon issued Ms. Ismail "a

15  Final Written Warning for her unprofessional behavior."[19]  (*Id.* at 9; *see also* Peterson

16  Decl. ¶ 18, Ex. 58.)  The warning stated that "[o]ver the course of the last two months,

17  you have exhibited a trend of inappropriate behavior that violates Amazon's published

18

19  ―――――――――――
     [19] Ms. Ismail contends that Mr. Butler issued Ms. Ismail a final written warning before

20  Amazon's finalized its investigation, but the sources she cites—the warning itself and her
     declaration—provide no support for that proposition.  (*See* Resp. at 11 (citing Peterson Decl.

21  ¶ 18, Ex. 58 at 2; Ismail Decl. ¶ 40).)  However, although Mr. Butler issued the warning a week
     before Ms. Murrow's May 25, 2015, report, HR had approved the warning based on the earlier

22  investigation.  (*See* Peterson Decl. ¶ 18; Ismail Decl. ¶ 40.)

Standards of Conduct.  Specific examples include an outright refusal to cooperate or communicate with your manager and/or supervisor including intentionally disregarding instructions."  (*Id.* at 2.)

Ms. Ismail did not go back to work after May 8, 2015, and remains formally on leave from Amazon.[20]  (Ismail Decl. ¶ 39.)  She "felt too traumatized and stressed about work" and "ended up going to a mental health provider in Washington," who told her she "should not go back to work."  (*Id.*)

On May 22, 2015, Ms. Ismail filed a charge with the Equal Employment Opportunity Commission ("EEOC").  (*See* Blatt Decl. ¶ 2, Ex. 1 (Dkt. # 30-1) ("EEOC Letter") at 2.)  On August 2, 2016, the EEOC determined that it was "unable to conclude that the information obtained establishes violations of the statutes," and issued a Right to Sue letter.  (*Id.*; *see also* Feulner Decl. ¶ 22, Ex. 520, (Dkt. # 39-2) at 139.)

**B.     Procedural Background**

On October 28, 2016, Ms. Ismail filed this lawsuit *pro se*.  (*See* IFP Mot. (Dkt. # 1); Compl. (Dkt. # 3).)  On January 12, 2017, Ms. Ismail moved for the appointment of counsel (MTA (Dkt. # 12)), and per the Western District of Washington's Pro Bono Screening Committee's recommendation, the court appointed counsel on March 23, 2017 (3/23/17 Order (Dkt. # 15); *see also* 2/23/17 Order (Dkt. # 14)).  After counsel for Ms. Ismail appeared, Ms. Ismail amended her complaint on June 30, 2017, asserting seven claims against Amazon.  (*See* FAC (Dkt. # 22); *see also* Stip. (Dkt. # 20).)  Ms. Ismail

---

[20] Amazon states that Ms. Ismail was on short-term disability until November 2015, but provides no citation to support that contention.  (*See* MSJ at 17 n.8.)

brings claims under Title VII of the Civil Rights Act of 1964 for disparate treatment based on her race and religion, for a hostile work environment based on her religion, and for retaliation. (FAC ¶¶ 5.1-5.7, 5.12-5.13); 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a). She also brings claims for violation of 42 U.S.C. § 1981 based on racial discrimination and retaliation. (*Id.* ¶¶ 5.8-5.11); 42 U.S.C. § 1981. Finally, she brings claims for racial and religious discrimination and retaliation under the Arizona Civil Rights Act ("ACRA"), Ariz. Rev. Stat. § 41-1461, *et seq.*[21] (*Id.* ¶¶ 5.14-5.15.)

Amazon moves for summary judgment on all of Ms. Ismail's claims. (*See generally* MSJ.) The court now addresses the motion.

## III.    ANALYSIS

### A.    Legal Standard

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

---

[21] Ms. Ismail's complaint does not expressly say that her ACRA claims are for both racial and religious discrimination (*see id.* ¶¶ 5.14-5.15), but because that section of the complaint incorporates her allegations by reference (*see id.*), the court assumes that she asserts such claims.

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of a dispute of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court must "view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal

quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Furthermore, the court may consider only materials that are capable of being presented in an admissible form. *See* Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment."). Nor can the plaintiff "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

**B.    Motion for Summary Judgment**

1. Claims at Issue and Motion to Strike

Before moving to the merits of Amazon's motion, the court addresses two preliminary matters: (1) what issues and claims remain for resolution, and (2) Amazon's request that the court strike Charles Ansett's notes. First, Amazon contends that Ms. Ismail alleges theories and conduct that she did not include in her EEOC charge and that occurred more than 300 days before she filed the charge. (MSJ at 18.) Specifically, Amazon argues that the January 2014 altercation between Ms. Ismail and her coworker, Mahad Farah, *see supra* n.6, did not involve any discrimination and occurred more than 300 days before she filed her EEOC charge (MSJ at 18-19); *see also* 42 U.S.C.

§ 2000e-5(2)(1) (stating that an EEOC charge must be filed within 180 days "after the alleged unlawful employment practice occurred" or if the complainant "initially instituted proceedings with a State or local agency, "within 300 days "after the alleged unlawful employment practice occurred").  Moreover, allegations of discrimination are actionable only if they fall within the scope of—or can reasonably be expected to arise from—an EEOC investigation, *see EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994), and if they occur within "the statutory time period," *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105 (2002).  In response, Ms. Ismail states that she relies on that incident only to place her other factual allegations in context—not as providing the basis for any of her claims.  (Resp. at 23); *see also supra* § II.A.  Based on Ms. Ismail's representation and the relevant authority, the 2014 incident involving Ms. Ismail and Mr. Farah provides no independent basis for Ms. Ismail's claims, and the court only considers the incident as context for Ms. Ismail's other claims.

Second, Ms. Ismail "concedes that her claims for racial discrimination under Title VII and Section 1981 should be dismissed."[22]  (Resp. at 14; *see also* MSJ at 21 (arguing

---

[22] Section 1981 prohibits discrimination in the "benefits, privileges, terms, and conditions" of employment, 42 U.S.C. § 1981(b); *see also Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008), and "encompasses claims of retaliation" based on racial discrimination, *see CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  Section 1981 applies only to race-based discrimination.  *See Runyon v. McCrary*, 427 U.S. 160, 168 (1976); *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 798 (9th Cir. 2003).  Although Ms. Ismail does not explicitly concede that her retaliation case under Section 1981 also fails, the court infers that Ms. Ismail intends to so concede because although she did not address retaliation under Section 1981 in her response, the retaliation claim can only be based on a reasonable belief of racial discrimination—something she does not substantively address in her response.  (*See generally* Resp.; Reply at 1 (stating that Ms. Ismail fails to offer any evidence that she reported race discrimination while she worked at the GSCC).)  Thus, she offers no evidence of retaliation

1  that Ms. Ismail "cannot show that her race was a motivating factor in any of Amazon's

2  decisions").)  Thus, the court grants Amazon's motion for summary judgment on Ms.

3  Ismail's racial discrimination claim under Title VII and racial discrimination and

4  retaliation claims under 42 U.S.C. 1981.  *See Parque v. Fort Sage Unified Sch. Dist.*, No.

5  2:15-cv-00044-MCE-CMK, 2017 WL 3601383, at *2 n.3 (E.D. Cal. Aug. 22, 2017)

6  (granting summary judgment for the defendant because the plaintiff conceded that the

7  court should dismiss her claim); *Hesseldahl v. Or. Dep't of Veterans' Affairs*,

8  No. 05-1649-TC, 2007 WL 1541502, at *2 (D. Or. May 23, 2007) (same).  Furthermore,

9  because Arizona law treats racial discrimination claims under ACRA in the same manner

10  as racial discrimination claims under Title VII, the court also dismisses the ACRA claim.

11  *See Ariz. ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1198 (9th Cir. 2016) ("The

12  ACRA is modeled after and is generally identical to Title VII of the Civil Rights Act."

13  (internal quotation marks omitted) (citing *Higdon v. Evergreen Int'l Airlines, Inc.*, 673

14  P.2d 907, 909-10 n.3 (Ariz. 1983))); *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075,

15  1084 (D. Ariz. 2017) (stating that "ACRA is generally identical to Title VII").

16          The court next turns to Ms. Ismail's theory that Amazon failed to accommodate

17  her religious practice.[23]  In her response brief, Ms. Ismail argues that her religious

18  _____

19  based on a report of racial discrimination, and the court accordingly grants summary judgment
   on this claim.

20      [23]  "A plaintiff who fails to raise a reasonable inference of disparate treatment on account
   of religion may nonetheless show that [her] employer violated its affirmative duty under Title
21  VII to reasonably accommodate employees' religious beliefs." *Peterson v. Hewlett-Packard
   Co.*, 358 F.3d 599, 606 (9th Cir. 2004).  To prove a failure to accommodate claim, a plaintiff
22  must establish a prima facie case that (1) she had "a bona fide religious belief, the practice of

discrimination claim based on a failure to accommodate survives summary judgment. (Resp. at 19-21.) Amazon contends, however, that Ms. Ismail never pleaded that theory or any allegations supporting it. (Reply at 9.) The court agrees that Ms. Ismail never raised this theory until responding to Amazon's motion. (*See generally* Am. Compl.) Ms. Ismail therefore improperly invokes the theory, and the court declines to consider her arguments to that effect. *See Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 n.7 (9th Cir. 2004) (stating that where "[t]here is no evidence in the original complaint . . . that [the plaintiff] ever intended to use [a failure to accommodate] theory of religious discrimination in making her Title VII claim," the court "need not engage in hypotheticals" on summary judgment); *Schlitt v. Abercrombie & Fitch Stores, Inc.*, No. 15-cv-01369-WHO, 2016 WL 2902233, at *10 (N.D. Cal. May 13, 2016) (stating that the plaintiff could not in response to summary judgment raise an "alleged failure to accommodate as a theory of liability given that she did not plead it"); *see also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089

//

---

which conflicts with an employment duty," (2) she informed her employer of "the belief and conflict," and (3) the employer "discharged, threatened, or otherwise subjected [her] to an adverse employment action because of [her] inability to fulfill the job requirement." *Id.* Unpaid leave is a reasonable accommodation unless an employer uses it to target an employee's absence for religious reasons. *Cf. Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70-71 (1986) ("We think that the school board policy in this case, requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one. . . . But unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones."); *Mills v. PeaceHealth*, 31 F. Supp. 3d 1099, 1113 (D. Or. 2014) ("To the extent that plaintiff was required to use [paid time off] to accommodate his religious needs, defendant's policy does not constitute a failure to accommodate.").

(9th Cir. 2010) (stating that a party "may not effectively amend its complaint by raising a new theory . . . in its response to a motion for summary judgment").

Finally, Amazon moves to strike psychologist Charles Ansett's notes about Ms. Ismail's psychological difficulties stemming from her employment. (Reply at 12.) Amazon argues that Ms. Ismail never identified Mr. Ansett as an expert witness and his testimony is hearsay and not based on personal knowledge. (*Id.*) However, even though Mr. Ansett's notes could support Ms. Ismail's subjective belief that her workplace was abusive, the court concludes that her workplace was not abusive from an objective standpoint. *See infra* § III.B.4. Therefore, the court denies Amazon's request.

Now that the court has disposed of those preliminary matters, it turns to the merits of Amazon's motion.

### 2. Disparate Treatment

Title VII of the Civil Rights Act of 1964 prohibits employers from taking adverse employment action against "any individual . . . because of such individual's race, color, religion, sex, or national origin."[24] 42 U.S.C. § 2000e-2(a); *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, --- U.S. ----, 135 S. Ct. 2028, 2031 (2015). "A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment . . . ." *Peterson*, 358 F.3d at 603.

//

---

[24] Title VII defines "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate" a "religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

To survive summary judgment on a disparate treatment claim, Ms. Ismail "must establish that [her] job performance was satisfactory and provide evidence, either direct or circumstantial, to support a reasonable inference that [the adverse employment] action was discriminatory." *Id.* A plaintiff can make that prima facie showing by offering direct evidence of disparate treatment or via the *McDonnell Douglas* four-part test. *See id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Young v. United Parcel Serv., Inc.*, --- U.S. ----, 135 S. Ct. 1338, 1345 (2015) (stating that a plaintiff can prove disparate treatment "either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*"); *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003) ("Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." (internal quotation marks and brackets omitted)); *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) ("Circumstantial evidence . . . is evidence that requires an additional inferential step to demonstrate discrimination."); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007) (stating that *McDonnell Douglas* "sets forth a proof framework with two distinct components: (1) how a plaintiff may establish a prima facie case of discrimination absent direct evidence, and (2) a burden-shifting regime once the prima facie case has been established"). The burden of demonstrating a prima facie case is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 (1981); *see also Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017) (stating that the Ninth Circuit "require[s] very little evidence to survive summary judgment in a

discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record" (internal quotation marks omitted)).

Under the *McDonnell Douglas* framework, Ms. Ismail can demonstrate a prima facie case of religious discrimination by showing that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Peterson*, 358 F.3d at 603.

If Ms. Ismail demonstrates a prima facie case by utilizing those four factors or through direct evidence, "the burden shifts to the defendant to produce some evidence demonstrating a legitimate, nondiscriminatory reason for the employee's termination." *Bodett*, 366 F.3d at 743. If the defendant demonstrates such a reason, the presumption that the defendant discriminated against the plaintiff "drops from the case," and the plaintiff "must then show that the defendant's alleged reason for termination was merely a pretext for discrimination." *Id.*

Amazon moves for summary judgment on Ms. Ismail's disparate treatment claim, contending that she cannot demonstrate a prima facie case of religious discrimination because her religion was not a motivating factor in any adverse action by Amazon.[25]

---

[25] Amazon thus invokes a mixed-motive defense. *See Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007). However, Amazon's arguments focus on the *McDonnell Douglas* framework, so the court does not address the mixed-motive defense. (*See* MSJ at 22-24.) In any

ORDER - 30

(MSJ at 22.)  Amazon further argues that even if Ms. Ismail can show a prima facie case,

Amazon can demonstrate legitimate reasons for its actions.  (*Id.* at 24.)  Ms. Ismail

contends that she has "presented sufficient circumstantial evidence that Amazon's

treatment [of] and fixation [on] her breaks w[as] different than similarly situated

non-Muslim employees." (Resp. at 17.)  She also argues that her claim survives under

the *McDonnell Douglas* framework because of how Mr. Peterson treated her "prayer

breaks" and "the defacement of her prayer materials." (*Id.* at 18.)  Although Ms. Ismail

claims that she raises "a triable claim under both approaches," *i.e.*, using the *McDonnell*

*Douglas* test and by presenting sufficient other evidence, her arguments utilize the

language of the *McDonnell Douglas* test.[26]  (*See* Resp. at 17-18); *cf. Reynaga*, 847 F.3d at

691 ("[N]othing compels the parties to use the *McDonnell Douglas* framework."); *Pac.*

*Shore Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013)

(stating that a plaintiff alleging disparate treatment need not invoke the *McDonnell*

*Douglas* framework to demonstrate a prima facie case).  Accordingly, under that

//

---

event, "even if proven as an undisputed fact," a mixed-motive defense "does not provide a basis for summary judgment in a Title VII case." *Metoyer*, 504 F.3d at 531.

[26] Ms. Ismail's reliance on both the *McDonnell Douglas* test and circumstantial evidence as demonstrating an inference of discrimination likely stems from imprecision in the case law regarding how a plaintiff can make out a prima facie case of discrimination in opposition to summary judgment.  For example, some cases state that a plaintiff can show discrimination either via the *McDonnell Douglas* test or direct evidence, *see, e.g.*, *Young*, 135 S. Ct. at 1345; *Noyes*, 488 F.3d at 1168, while other cases state that a plaintiff can make that showing via the *McDonnell Douglas* test or direct or circumstantial evidence, *see, e.g.*, *Vasquez*, 349 F.3d at 640. Because both the *McDonnell Douglas* test and circumstantial evidence rely on inferences of discrimination to support a prima facie case, the inquiry is substantially similar.

framework, the court analyzes whether Ms. Ismail establishes a prima facie case that

Amazon treated her differently because of her religion.

### a. Prima Facie Case

The parties address only two parts of the *McDonnell Douglas* test: (1) adverse

employment action, and (2) similarly situated individuals who were treated more

favorably or other circumstances giving rise to an inference of discrimination.[27] (*See*

MSJ at 22-23; Resp. at 17-19.) Because the court concludes that Ms. Ismail fails to

demonstrate similarly situated individuals who were treated more favorably or other

circumstances giving rise to an inference of discrimination, the court does not address the

other parts of the *McDonnell Douglas* test.

"[I]ndividuals are similarly situated when they have similar jobs and display

similar conduct." *Vasquez*, 349 F.3d at 641. Moreover, the identified employees "must

be similarly situated . . . in all material respects." *Moran v. Selig*, 447 F.3d 748, (9th Cir.

2006); *see also Levy v. Mandalay Corp.*, No. 2:14-cv-01636-GMN-NJK, 2015 WL

3629633, at *2 (D. Nev. June 10, 2015) (stating that "similarly situated individuals must

be identified with specificity to create an inference that the employer's motivations were

based on the plaintiff's status as a member of a protected class and that similarly situated

employees outside of the protected class and identified as such were treated more

favorably"). The Ninth Circuit has "upheld inferences of discriminatory motive based on

---

[27] Amazon raises Ms. Ismail's performance issues but only in the context of its legitimate, nondiscriminatory reasons for its employment actions against Ms. Ismail. (*See* MSJ at 24.)

comparative data involving a small number of employees when the plaintiff establishes that he or she is 'similarly situated to those employees in all material respects.'" *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 885 (9th Cir. 2007) (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)).

Ms. Ismail contends that Amazon treated her breaks differently from the breaks of similarly situated employees.[28] (Resp. at 17.) She points out that she was the only Muslim on Team 4, and the only person who used her breaks to pray. (Resp. at 17; Ismail Decl. ¶ 3.) She also presents time sheet evidence showing that she took lunch breaks longer than 30 minutes less often than Mr. Graves, Mr. Chavez, and Mr. Banks. (*See* Feulner Decl. ¶ 23, Ex. 521 at 142-45.) However, because the employees had to clock out for 30-minute breaks but did not do so for 15-minute paid breaks, an employee violating the break policy as to only 30-minute breaks is not necessarily similarly situated to an employee violating the 15-minute break policy. Thus, Ms. Ismail fails to show that in this instance she is materially similar in all respects to those coworkers. *See Vasquez*, 349 F.3d at 641. Furthermore, the evidence in the record belies her contention. Mr. Chavez was coached because he went over his 15-minute breaks, and he also received a negative performance review. (*See* Murrow Decl. ¶ 2, Ex. 81 at 17; Bland Decl. ¶ 6.)

---

[28] She further states that "other employees were allowed to do various non-religious, extra-curricular activities without harassment or being told that they must clock out." (Resp. at 17; *see also* Ismail Decl. ¶¶ 8-9.) As Ms. Ismail frames her claims, however, the length of Ms. Ismail's breaks—both paid and unpaid—and Amazon's response to Ms. Ismail's breaks are the key issues. Thus, Ms. Ismail's assertion that Amazon allowed other employees to do non-work activities when they were not on break does not support a claim of disparate treatment in how Amazon handled employees' breaks.

Although being "coached" is not the same as receiving a written warning, Ms. Ismail does not address whether Mr. Chavez's failure to comply with the break requirement was comparable to her failure.

Ms. Ismail also points to J'Dyn Banks' "pattern of tardiness," which Amazon handled "through a 'private conversation' instead of disciplinary action," as demonstrating disparate treatment. (Resp. at 18.) Mr. Peterson stated that he spoke to Mr. Banks "about his pattern of tardiness, and told him that any subsequent tardiness over the next couple of months would result in a documented coaching, and not just a private, verbal conversation."[29] (5/25/15 Rep. at 11.) As with her other argument, Ms. Ismail fails to show that Mr. Banks engaged in similar conduct. The court cannot discern whether Mr. Banks' "pattern of tardiness" entailed behavior similar to Ms. Ismail's in terms of the frequency of her over-length breaks and the amount of extra time she took for breaks. In addition, it is not clear that Mr. Banks' "tardiness" amounts to the same kind of violation of Amazon's policy as Ms. Ismail's extended breaks did. *See Vasquez*, 349 F.3d at 641 (finding that employees were not similarly situated "where the type and severity of an alleged offense was dissimilar"). Moreover, when Ms. Ismail had been late to 8 out of 11 shifts in October 2014, Mr. Bland "coached" Ms. Ismail about arriving at work on time. (*See* Resp. at 4 (citing Bland Decl. ¶ 4, Ex. 41 at 2).) That evidence suggests that Ms. Ismail and Mr. Banks were treated the same when they committed

---

[29] Although Ms. Ismail does not identify Saul Chavez as a similarly situated individual, the court notes that Mr. Peterson also stated that Mr. Chavez received a "documented verbal coaching . . . because he recently took an extra 8 minutes for lunch." (5/25/15 Rep. at 11.)

similar violations. And indeed, Ms. Ismail received that "coaching" before any allegedly differential treatment occurred. (*Compare* Coaching at 2, *with* Ismail Decl. ¶ 25.)

Although Ms. Ismail fails to demonstrate a prima facie case by showing that similarly situated individuals outside her religion were treated more favorably, she may make her case by demonstrating that "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603. Ms. Ismail also identifies the defacement of her prayer cloth as giving rise to an inference of religious discrimination. (*See* Resp. at 17.) Ms. Ismail contends that Mr. Peterson stepped on the cloth because it had a boot mark on it, and she observed him wearing boots that day. (Ismail Decl. ¶ 29.)

"[E]vidence that a supervisor who exhibited discriminatory animus and who influenced or participated in the [adverse employment action] is sufficient to show a triable [dispute] of fact for the jury regarding discriminatory motive" for the adverse action. *Belgrove v. N. Slope Borough Power, Light & Pub. Works*, 982 F. Supp. 2d 1040, 1047 (D. Alaska 2013) (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005)). However, an event will not necessarily give rise to an actionable claim if that event does not support "discriminatory motive" in the adverse employment action. *See id.* Such is the case here. At most, the evidence shows that someone stepped on Ms. Ismail's prayer cloth. (*See* Ismail Decl. ¶ 29; Peterson Decl. ¶ 20, Ex 62 at 3.) Even if Mr. Peterson was that person, there is no indication that he did so because of discriminatory animus. Thus, this incident is insufficient to give rise to an inference of discrimination supporting a disparate treatment claim.

###### b. Legitimate, Nondiscriminatory Reason

Even if Ms. Ismail had demonstrated a prima facie case of disparate treatment, however, Amazon had legitimate, nondiscriminatory reasons for coaching Ms. Ismail, negatively evaluating her performance, investigating her conduct, and issuing a final written warning.[30]  (*See* Resp. at 15 (identifying those employment decisions as adverse actions)); *see also Vasquez*, 349 F.3d at 641 (assuming that the plaintiff could make out a prima facie case and addressing the defendant's reason for the adverse employment decision).  Amazon points specifically to Ms. Ismail's performance, refusal to follow Amazon policies regarding her breaks and work hours, and Ms. Ismail's unprofessional behavior.[31]  (MSJ at 24.)

To demonstrate a legitimate, nondiscriminatory reason, "'the defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its employment decision which, if believed by the trier of fact, would support a finding that the employment action was not a result of unlawful discrimination."  *Noyes*, 488 F.3d at

---

[30] Ms. Ismail identifies other adverse actions:  denial of transfers; demotion from escalation specialist; stepping on her prayer materials, and labeling her a black sheep in a group chat.  (*See* Resp. at 15.)  The first two actions, however, occurred before the alleged disparate treatment began.  Mr. Bland denied Ms. Ismail the opportunity to interview for a transfer and demoted her before Mr. Peterson became Ms. Ismail's manager and allegedly began treating her breaks differently from her coworkers' breaks.  (*See* Bland Decl. ¶ 5; Peterson Decl. ¶ 1; Ismail Decl. ¶ 6 (stating that Mr. Bland had no problems with her breaks); Feulner Decl. ¶ 16, Ex. 514 at 15-17.)  Moreover, the second two actions are not adverse employment actions as a matter of law in the disparate treatment context.  Although Ms. Ismail found them offensive, those actions did not "materially affect the compensation, terms, conditions, or privileges of . . . employment."  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (citations and internal quotation marks omitted)).

[31] Ms. Ismail's arguments to the contrary are essentially aimed at showing Amazon's proffered reasons are pretextual.  (*See* Resp. at 17-18.)

1169 (quoting *Burdine,* 450 U.S. at 255). Performance-related concerns and disobeying a supervisor's orders sufficiently rebut a showing of discriminatory intent. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003) (performance-related concerns); *Vasquez*, 349 F.3d at 641 (failure to follow a supervisor's direction).

Here, Amazon submits ample evidence that it disciplined Ms. Ismail because she failed to follow the break policy, acted unprofessionally with her coworkers, and failed to timely complete a self-review. (*See* Bland Decl. ¶ 10, Ex. 45 (stating that Ms. Ismail "struggled periodically throughout the year with punctuality" and her "peer to peer communication ha[d] on several occasions become unproductive and unprofessional").) During Mr. Bland's supervision of Team 4, he coached Ms. Ismail on her tardiness, her interactions with her coworkers, and certain performance deficiencies. (*See* Coaching at 2.) In addition, Mr. Peterson documented numerous instances in which Ms. Ismail failed to adhere to Amazon's break policy and 12-hour shift limit. (Peterson Decl. ¶ 7; *id.*, Ex. 48A; *id.* ¶ 5.) During Mr. Peterson's supervision, Ms. Ismail's colleagues also reported several instances in which Ms. Ismail used inappropriate language. (See Bland Decl. ¶ 16.) Finally, Ms. Ismail did not timely complete a self-evaluation as requested by her supervisor. (*See* Renner Decl. ¶ 7.) Taken together, this evidence demonstrates that Amazon had legitimate, nondiscriminatory reasons for progressively disciplining Ms. Ismail. Thus, the burden shifts back to Ms. Ismail to show that these reasons were mere pretext for religious discrimination.

//

//

*c. Pretext*

Ms. Ismail fails to show that Amazon's legitimate, nondiscriminatory reasons are merely pretext for discrimination.[32]  (*See* Resp. at 17-19.)

The plaintiff may prove pretext directly or indirectly, *see Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002), but does not have a "new burden of production," *Noyes*, 488 F.3d at 1169.  "[A] plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons*, 307 F.3d at 1113 (internal quotation marks omitted).  To demonstrate pretext, circumstantial evidence must be "specific" and "substantial."  *Cornwell v. Electra Cent. Credit. Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006).  The Ninth Circuit "temper[s]" that requirement, however, by holding that in Title VII cases, "the burden on plaintiffs to raise a triable [dispute] of fact as to pretext is hardly an onerous one." *Noyes*, 488 F.3d at 1170 (internal quotation marks omitted).  A plaintiff need only show that a "rational trier of fact could, on all the evidence, find that [the defendant's] explanation was pretextual and that therefore its action was taken for impermissibly discriminatory reasons." *Pottenger*, 329 F.3d at 746.

Ms. Ismail argues that Amazon's explanation is pretextual because (1) Mr. Peterson treated her breaks differently than other Team 4 members' breaks, (2) other

---

[32] In moving for summary judgment, Amazon states only that Ms. Ismail "cannot offer significant evidence that these legitimate reasons were pretext for discrimination against [her] because of her religion."  (MSJ at 24.)

supervisors gave other Muslim employees more than three breaks, and (3) someone—who Ms. Ismail believes to be Mr. Peterson—stepped on her prayer cloth. (Resp. at 18-19.) That evidence does not demonstrate Amazon's legitimate and nondiscriminatory explanation for its actions are mere pretext for discrimination.

As the court discussed above, Ms. Ismail does not show that her coworkers engaged in truly comparable conduct, and evidence before the court belies her contention that Amazon treated her breaks differently. *See supra* § III.B.2.a. Moreover, Ms. Ismail's supervisors consistently identified other issues, such as Ms. Ismail's unprofessional interactions with her coworkers, as a cause for concern and a basis for escalating discipline. Ms. Ismail therefore shows no inconsistency or other reasons to disbelieve Amazon's proffered reasons. *Cf. Lyons*, 307 F.3d at 1113.

Nor does Ms. Ismail show that discrimination most likely motivated Amazon's decisions. *Cf. id.* The fact that someone—even if it was Mr. Peterson—stepped on her prayer cloth is at best circumstantial evidence of discriminatory intent. However, it is neither "specific" nor "substantial" because Ms. Ismail makes that inference based only on the facts that Mr. Peterson wore boots on the day she noticed the mark and he enforced Amazon's break policy. (*See* Ismail Decl. ¶ 29); *Cornwell*, 439 F.3d at 1028 n.6.

In addition, Ms. Ismail incorrectly characterizes the evidence regarding the three other Muslim employees that HR interviewed as part of its investigation. (*Compare* Resp. at 19, *with* 5/25/15 Rep. at 5.) She states that those employees "apparently" took more than three breaks. (Resp. at 19.) Although they may have done so, those

employees nevertheless took breaks totaling no longer than the 45-minute paid breaks that Amazon policy allows.  (5/25/15 Rep. at 5.)  Thus, the fact that other Muslim employees may have arranged their paid breaks differently does not illustrate pretext.

For the foregoing reasons, Ms. Ismail fails to rebut Amazon's legitimate, nondiscriminatory reasons for its employment decisions.  The court accordingly grants Amazon's motion for summary judgment on this claim and next addresses the retaliation claim.[33]

### 3. Retaliation

Amazon also moves for summary judgment on Ms. Ismail's religious retaliation claim.  (MSJ at 24-25.)  Title VII prohibits an employer from discriminating against an employee because the employee "opposed any practice" proscribed by Title VII.  42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006).  To demonstrate a prima facie case of retaliation, Ms. Ismail must establish "that she engaged in protected activity, that she suffered a materially adverse [employment] action, and that there was a causal relationship between the two."  *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013).  A Title VII retaliation claim is also subject to the *McDonnell Douglas* burden-shifting framework.

---

[33] Because claims for religious discrimination under ACRA are treated the same as those under Title VII, the court also grants summary judgment on Ms. Ismail's ACRA claims for religious discrimination.  *See Horne*, 816 F.3d at 1198 (internal quotation marks omitted) ("The ACRA is modeled after and is generally identical to Title VII of the Civil Rights Act."); (MSJ at 17 (arguing that Ms. Ismail's ACRA claims fail due to the statute of limitations); *id.* at 17 n.9 (arguing that even if the statute of limitations does not bar these claims, Ms. Ismail's ACRA claims fail for the same reasons as her claims under Title VII fail); Resp. at 23-24 (arguing that equitable tolling applies to Ms. Ismail's ACRA claims).)

*See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003). Thus, if the employee demonstrates a prima facie case, the burden shifts to the employer to demonstrate it had a legitimate, nondiscriminatory reason for taking the adverse employment action. *Id.* If the employer does so, the employee must then demonstrate that the employer's reason for the adverse employment action was merely pretext. *Id.*

Amazon's motion starts from the premise that Ms. Ismail first engaged in protected activity on April 24, 2015, when she made her first ethics complaint. (MSJ at 25.) From there, Amazon contends that the only adverse action it took against Ms. Ismail after she filed those complaints was the May 18, 2015, final written warning. (*Id.*) Amazon asserts that Ms. Ismail cannot show causation because Amazon based the May 18, 2015, final written warning on the investigation that Amazon completed on April 23, 2015. (*Id.*) Furthermore, Amazon states that the other adverse actions Ms. Ismail identifies—denial of overtime and transfer opportunities and her poor performance evaluation—occurred before she submitted the ethics complaints. (*Id.*)

Ms. Ismail, however, identifies two protected activities occurring before the ethics complaints: (1) in December 2014 and January 2015, when she raised concerns about Migail Graves' inappropriate behavior, and (2) on April 2, 2015, when she told Mr. Butler that Mr. Peterson was discriminating against her. (Resp. at 14-15.) Ms. Ismail further identifies eight adverse actions that she contends would "deter a reasonable person from pursuing a claim of discrimination":

> (1) denial of transfers; (2) the demotion from escalation specialist; (3) issuing her a false disciplinary warning on April 2; (4) the stepping on [Ms.] Ismail's prayer materials on April 2; (5) a negative performance evaluation; (6) [Mr.]

Butler's initiation of an investigation to try to determine if he could fire [Ms.] Ismail; (7) the labelling of [Ms. Ismail] as a black sheep in the group chat; and (8) Amazon's issuance of a final, written warning.

(*Id.* at 15.)  The court thus begins by examining whether Ms. Ismail demonstrates a prima facie case of retaliation.

        *a.   Prima Facie Case*

            i.   Protected Activity

An employee undertakes a protected activity when the employee reports "an employment practice that either violates Title VII or that the employee reasonably believes violates that law."  *Westendorf*, 712 F.3d at 422.  Thus, an employee may make a mistake of law in thinking that the employer violated Title VII, and the court assesses reasonableness "according to an objective standard—one that makes due allowance . . . for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims."  *Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994).  Thus, even if a plaintiff could not demonstrate a prima facie case of discrimination under Title VII, she may still have had a reasonable belief her employer was discriminating against her, and therefore establish a prima facie case of retaliation. *See Westendorf*, 712 F.3d at 422.

The court first concludes that Ms. Ismail's reports regarding Mr. Graves' behavior cannot support a retaliation claim.  Ms. Ismail does not allege that Mr. Graves' behavior was related to her religion.  (*See generally* Ismail Decl.)  Thus, it was neither subjectively nor objectively reasonable for Ms. Ismail to think she was engaging in protected activity when she reported Mr. Graves' verbal abuse as unprofessional behavior.  (*See* Resp. at 5

("[Ms.] Ismail complained to [Mr.] Bland about conflicts with her co-worker Migail

Graves and Graves' inappropriate behavior."); Ismail Decl. ¶¶ 15-21.)  She simply was

not opposing "any practice made an unlawful employment practice" by Title VII.  *See* 42

U.S.C. § 2000e-3.  However, Ms. Ismail's complaint to Mr. Butler about discrimination

and her Ethics Hotline complaints constitute protected activity.[34]  (Ismail Decl. ¶ 28

(stating that on April 2, 2015, Ms. Ismail told Mr. Butler about "Levy Bland's favoritism

toward other employees, Mr. Peterson's discrimination and harassing [her] related to

[her] prayer breaks, and the lack of teamwork in Team 4")); *Passantino v. Johnson &

Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) (stating that "informal

complaints constitute a protected activity" and "actions taken against [the plaintiff] after

these initial complaints are appropriately the subject of [a] retaliation claim").  Taking

into account her limited knowledge, Ms. Ismail could have reasonably believed that Mr.

Peterson's enforcement of Amazon's break policy—which impacted Ms. Ismail's prayer

time—amounted to discrimination.  (*See* Ismail Decl. ¶ 28); *Moyo*, 40 F.3d at 985.

ii.  Adverse Employment Action

The court next analyzes whether any of the employment actions she identifies

were materially adverse, and concludes that Ms. Ismail fails to demonstrate that the

prayer cloth incident and use of a black sheep photo in a group were materially adverse

---

[34] Because the April 2, 2015, report sufficiently supports Ms. Ismail's prima facie case,
the court declines to further address the two complaints to Amazon's Ethics Hotline.  *See infra*
§ III.B.3.a.i.

employment actions.[35]  The materially adverse employment action must be such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," even if the action did not affect "the terms and conditions of employment." *White*, 548 U.S. at 60.  "[T]he significance of any given act of retaliation will often depend on the particular circumstances." *Id.* at 69.  Petty slights and minor annoyances are not materially adverse.  *Miller v. City & Cty. of Honolulu, Dep't of Customer Servs.*, No. 07-00120 JMS/KSC, 2008 WL 11344897, at *9 (D. Haw. Oct. 30, 2008) (listing denials of breaks and schedule changes, performance of routine undesirable tasks, and negative comments); *cf. Arthur v. Whitman Cty.*, 24 F. Supp. 3d 1024, 1036 (E.D. Wash. 2014) (finding that a presenter committed no materially adverse employment action when he used the plaintiff's name in a sexual harassment presentation and the plaintiff had made a sexual harassment complaint against another employee).  However, the court views actions cumulatively to determine whether they are materially adverse. *Miller*, 2008 WL 11344897, at *9-10.

Even though someone stepping on her prayer cloth and using a black sheep photo are akin to the kind of slights that are not actionable, Ms. Ismail identifies other relevant adverse events occurring after her April 2, 2015, report to Mr. Butler.  She specifically cites (1) her negative performance review on April 12, 2015, (2) Mr. Butler's April 7, 2015, request that HR investigate whether Amazon could terminate Ms. Ismail, and (3)

---

[35] The court's analysis of adverse employment action to support a discrimination claim does not apply here because an adverse employment action is defined more narrowly in that context than in the retaliation context.  *See Miller*, 2008 WL 11344897, at *11.

Amazon's final written warning on May 18, 2015.  Viewed in the light most favorable to Ms. Ismail, those actions are materially adverse because they could have "dissuaded a reasonable worker" from reporting discrimination.  *White*, 548 U.S. at 60.

### iii. Causation

Retaliation claims under Title VII "must be proved according to traditional principles of but-for causation."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action."  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (stating that to support "an inference of retaliatory motive, the [adverse action] must have occurred fairly soon after the employee's protected expression").

Ms. Ismail relies on temporal proximity to demonstrate causation.  (*See* Resp. at 16.)  That showing is sufficient because the adverse actions happened shortly after Ms. Ismail's April 2, 2015, report to Mr. Butler.  (*See* Ismail Decl. ¶ 28 (describing that report).)  Specifically, five days later, Mr. Butler recommended to HR that Amazon terminate Ms. Ismail (Feulner Decl. ¶ 19, Ex. 517 at 54-55); ten days later, Mr. Bland gave Ms. Ismail a negative performance review (Bland Decl. ¶ 10, Ex. 45); and about six weeks later, Amazon issued Ms. Ismail a final written warning (5/25/15 Rep. at 9).  Those events are close enough in time to Ms. Ismail's report to give rise to an inference of causation.  *See Dawson*, 630 F.3d at 936.

//

*b.  Legitimate, Nondiscriminatory Reason*

Because Ms. Ismail demonstrates a prima facie case of retaliation, Amazon now has the burden of showing that it had legitimate, nondiscriminatory reasons for the adverse employment actions.  For the same reasons discussed above, *see supra* § III.B.2.b, the court concludes that Amazon demonstrates such reasons.

*c.  Pretext*

The standard for demonstrating pretext in the context of a retaliation claim is the same as for a discrimination claim:  Ms. Ismail may show pretext "either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry,* 424 F.3d at 1037.  Ms. Ismail relies on (1) the proximity between her protected activity and the adverse employment actions, and (2) that Amazon treated other similarly situated employees differently.  (Resp. at 16-17.)

Where an employer was already contemplating action against an employee before the protected activity and then imposed less severe discipline after the activity, temporal proximity alone will not support pretext.  *Knight v. Brown*, 797 F. Supp. 2d 1107, 1135 (W.D. Wash. 2011); *see also Dean v. Avis Budget Car Rental, LLC*, No. C10-0277MJP, 2011 WL 1790461, at *6 (W.D. Wash. May 10, 2011) (concluding that the plaintiff had not demonstrated prejudice because the defendant had considered terminating the plaintiff for poor performance even before he engaged in protected activity).  Such is the case here.  Before Ms. Ismail reported her belief that Mr. Peterson was discriminating against her, Amazon had already approved a "coaching" based on her over-length breaks.

(Peterson Decl. ¶ 12; Renner Decl. ¶ 4.)  In addition, her performance review was already underway before her meeting with Mr. Butler.  (*See* Bland Decl. ¶ 6 (stating that Mr. Bland completed the performance reviews for Team 4 prior to April 2015); *see also id.*, Ex. 43 (sending Mr. Peterson a copy of the performance improvement plans on March 31, 2015).)  Furthermore, as to the final written warning, on April 23, 2015, HR had initially recommended terminating Ms. Ismail, but Amazon decided instead to issue the final written warning.  (*See* Renner Decl. ¶ 9; Peterson Decl. ¶ 18, Ex. 58.)  When viewed in the context of those facts, Ms. Ismail's reliance on temporal proximity to demonstrate pretext falls short.

In addition, Ms. Ismail's invocation of similarly situated individuals also misses the mark.  Ms. Ismail makes no argument that similarly situated individuals are an appropriation consideration for a retaliation claim.  (*See* Resp. at 17.)  However, even if that were a proper way to support her claim, Ms. Ismail points to no individuals similarly situated to her in this specific context.  (*See id.*)  Put simply, she identifies no coworkers who also engaged in protected activity and then were not subject to materially adverse employment action.  (*See id.*)  Thus, this theory does not support a finding of pretext.

Because Ms. Ismail cannot show that Amazon's legitimate, nondiscriminatory reasons for investigating her conduct, giving her a negative performance review, and issuing a final written warning were merely pretext for retaliation, the court grants Amazon's motion for summary judgment on this claim.[36]

---

[36] For the same reasons, the court also grants summary judgment on Ms. Ismail's retaliation claim under ACRA.  *See Horne*, 816 F.3d at 1198.

4. <u>Hostile Work Environment</u>

Finally, Amazon seeks summary judgment on Ms. Ismail's hostile work environment claim. (MSJ at 27.) Amazon argues that no one made offensive comments regarding Ms. Ismail's religion during her time at Amazon and the boot print found on Ms. Ismail's prayer cloth was only a single, isolated incident. (*Id.*) Ms. Ismail argues that a combination of three things creates a genuine dispute of material fact regarding whether she suffered a hostile work environment: (1) an employee stepped on her prayer cloth and "Amazon took no meaningful action," (2) Mr. Peterson "focused almost exclusively" on Ms. Ismail's breaks and tried "to catch her violating the break policy for her prayer breaks," and (3) once Ms. Ismail said she did not want to discuss her breaks with Mr. Peterson, he "simply ramped up his attempts to speak" with her. (Resp. at 21.) Ms. Ismail also states that Amazon admits that "the overall environment on Team 4 was hostile." (*Id.* at 23.)

To establish a hostile work environment claim under Title VII, a plaintiff must show: "(1) that [s]he was subjected to verbal or physical conduct of a [religiously offensive] nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez,* 349 F.3d at 642. In determining whether conduct is severe and pervasive, the court focuses on the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). Conduct

must be so extreme as to alter a plaintiff's terms and conditions of employment, *id.* at

778, and the court analyzes whether such conduct is abusive from both a subjective and

objective viewpoint, *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir. 2000)

(citations and internal quotation marks omitted). "[T]he required showing of severity or

seriousness of the harassing conduct varies inversely with the pervasiveness or frequency

of the conduct." *Id.* at 926. Requiring conduct to be severe and pervasive in order to

support a hostile work environment claim ensures that Title VII does not become a

"civility code" requiring protection against the "sporadic use of abusive language,"

"jokes," and "occasional teasing." *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991,

998 (9th Cir. 2010).

The conduct Ms. Ismail describes is not severe or pervasive enough to support a

hostile work environment claim. The kind of conduct the Ninth Circuit recognizes as

sufficiently severe or pervasive enough is succinctly captured in the following string

citation from the District Court for the District of Hawaii:

> *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990) (no reasonable
> jury could have found a hostile work environment despite allegations that the
> employer posted a racially offensive cartoon, made racially offensive slurs,
> targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos,
> did not provide adequate police backup to Latino officers, and kept illegal
> personnel files on plaintiffs because they were Latino); *Draper v. Coeur
> Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998) (defendant created a hostile
> work environment where the plaintiff's supervisor made repeated sexual
> remarks about the plaintiff over a two-year period, calling her "gorgeous"
> and "beautiful" rather than her name, telling her about his sexual fantasies
> and his desire to have sex with her, commenting on her "ass," and asking
> over a loudspeaker if she needed help changing clothes); *Nichols v. Azteca
> Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001) (a male employee
> of the restaurant was subjected to a relentless campaign of insults,
> name-calling, vulgarities, and taunts of "faggot" and "fucking female whore"

by male co-workers and supervisors at least once a week and often several times a day); *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir. 2000) (no hostile work environment when a supervisor called female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in plaintiff's presence; the supervisor called the plaintiff "Medea"; the plaintiff complained about other difficulties with that supervisor; and the plaintiff received letters at home from the supervisor)).

*Kapu v. Sears, Roebuck & Co.*, CV. No. 09-00602 DAE BMK, 2010 WL 2943339, at *8 (D. Haw. July 27, 2010). Even when the court views the evidence in the light most favorable to Ms. Ismail, similar severe or pervasive conduct was simply absent from Ms. Ismail's workplace.

First, Mr. Peterson's multiple discussions with Ms. Ismail about her breaks do not demonstrate a continuing pattern of hostile conduct based on her religion. *Compare Haughton v. Brennan*, No. 3:15-cv-00888-HZ, 2016 WL 4216778, at *5 (D. Or. Aug. 8, 2016) ("[P]erformance-related comments made by a supervisor to an employee . . . typically do not support a Title VII hostile work environment claim."); *Arifi v. Fedex Ground Package Sys., Inc.*, No. 3:13-cv-001871-AC, 2015 WL 4568685, at *8 (D. Or. July 28, 2015) (concluding that "only seven instances" of comments explicitly related to the plaintiff's religion was not sufficiently pervasive); *Memon v. Deloitte Consulting, LLP*, 779 F. Supp. 2d 619, 636 (S.D. Tex. 2011) (stating that "sporadic work-related criticisms" do not support a hostile work environment claim), *with Olivieri v. Abbott Labs.*, Civil No. 05-1244 (ADC), 2008 WL 747082, at *7 (D.P.R. Mar. 19, 2008) (concluding that a hostile work environment claim survived because the plaintiff put forth evidence that her "co-workers made sarcastic religious statements, mockingly spoke in tongues, changed the lyrics in one of [the plaintiff's] religious songs so it

referenced rum, destroyed her religious CDs, and tampered with some of her work samples due to her religious beliefs").  Moreover, from the standpoint of an objective employee, the conduct that Ms. Ismail alleges would not have significantly altered her ability to work and her working conditions.

Although Ms. Ismail was undoubtedly offended by someone stepping on her prayer cloth, that incident alone is not sufficiently egregious to support a hostile work environment claim.  *Compare Fall v. Delta Air Lines, Inc.*, No. C15-0919JCC, 2016 WL 2962232, at *7 (W.D. Wash. May 20, 2016) (stating that even if a coworker's act of intentionally throwing away the plaintiff's prayer mat amounted to intentional discrimination, that act "represents a single occurrence, not evidence of an ongoing, hostile environment"); *Arifi*, 2015 WL 4568685, at *7 ("Where harassment is more isolated . . . [t]he abuse at issue must be grossly offensive, and courts seldom find that a single incident creates a hostile work environment."), *with Alkhawaldeh v. Nairn Concrete Servs., Inc.*, Civ. Action No. 14-2140, 2015 WL 3485855, at *2 (E.D. La. June 2, 2015) (finding that asking a Muslim employee why the supervisor did not like "Arabs and Muslims" and then showing that employee a beheading video was sufficient to withstand summary judgment); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) (concluding that a single incident of rape was sufficient to support a hostile work environment claim).  This is particularly so where Ms. Ismail puts forth no evidence that someone intentionally stepped on her prayer cloth and has no other evidence of overtly discriminatory conduct.  *See Olivieri*, 2008 WL 747082, at *7.  In

//

short, the events she identifies are simply not sufficiently severe or pervasive to have altered the conditions of her employment and created an abusive work environment.

In addition, Ms. Ismail's argument that Amazon itself acknowledged hostile conditions among Team 4 members misses the point. A plaintiff must show that the allegedly hostile behavior was discriminatory. *See Henkin v. Forest Labs., Inc.*, No. 01 Civ. 4255(AKH), 2003 WL 749236, at *8 (S.D.N.Y. Mar. 5, 2003). Although employees may be hostile to one another, that behavior cannot support a hostile work environment claim unless there is evidence "that this hostility was because of [the plaintiff's] protected class." *Id.*

Because no reasonable juror could conclude that Ms. Ismail suffered severe and pervasive conduct that altered the conditions of her employment, the court grants Amazon's motion for summary judgment on Ms. Ismail's hostile work environment claim.

## IV.    CONCLUSION

For the reasons set forth above, the court GRANTS Amazon's motion for summary judgment (Dkt. # 27) and DISMISSES Ms. Ismail's claims with prejudice. The

//

//

//

//

//

//

court also DENIES as moot the parties' stipulated motion to continue the trial date (Dkt. # 43) and the parties' motions in limine (Dkt. ## 44, 45).

Dated this 5th day of June, 2018.

JAMES L. ROBART
United States District Judge